In re Stephen J. JAMO and Lynn
M. Jamo, Debtors.

Stephen J. Jamo and Lynn
M. Jamo, Plaintiffs,

v.

Katahdin Federal Credit
Union, Defendant.

Bankruptcy No. 99–10448 JBH.
Adversary No. 00–1010.

United States Bankruptcy Court,
D. Maine.

Sept. 26, 2000.

Richard D. Violette, Jr., Brewer, ME, for Plaintiff.

Michael P. Harman, Millinocket, ME, for Defendant.

### MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Chief Judge.

Pending before me on a consolidated, stipulated record are two related matters: consideration of multiple reaffirmation agreements between Chapter 7 debtors, Stephen and Lynn Jamo, and Katahdin Federal Credit Union (KFCU); and the Jamos' complaint seeking damages and injunctive relief against KFCU for alleged violations of the automatic stay during reaffirmation negotiations. For the reasons set forth here, judgment will enter for the Jamos on their complaint. The integrated packet of reaffirmation agreements will be disapproved. Reaffirmation of the debtors' residential mortgage obligation to KFCU, as modified to eliminate terms that were inserted in violation of the automatic stay, will be approved.[1]

### Background

The Jamos petitioned for Chapter 7 relief on March 18, 1999, owing a total of $61,010 to KFCU on four notes and two credit card accounts: $37,079 on a note and mortgage secured by their residence; $12,731 on a trio of unsecured personal loans; and approximately $11,200 on two VISA card accounts.[2] The Jamos scheduled only $12,810 in non-KFCU debt, all unsecured.

The Chapter 7 case progressed in a straight line from petition to discharge,

1. This memorandum sets forth my findings of facts and conclusions of law in accordance with Fed. R. Bankr.P. 7052 and Fed.R.Civ.P. 52. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101, *et seq.*

2. The figures may not be precise. Those appearing in counsels' correspondence differ from those scheduled by the Jamos. As this dispute is not about the amounts of KFCU's claims, there is no need for precision.

but reaffirmation issues made for a prolonged production.

A. *Negotiations*

Reaffirmation negotiations commenced immediately after the debtors filed their petition. Within about a month, the debtors' attorney requested that KFCU provide a mortgage reaffirmation agreement. The credit union's attorney stated that KFCU "does not agree to such reaffirmations," reciting the "Credit Union's long-standing policy in such matters":

It shall be the policy of Katahdin Federal Credit Union to allow members to reaffirm debts owed to the credit union. If members have more than one debt with KFCU, all debts must be reaffirmed or re-written (post-petition). Reaffirmation will not be granted to members who wish to have some debts excused (discharged), and to reaffirm others.

For example, a member filing bankruptcy may not reaffirm a car loan, but allow a Visa balance, and/or mortgage debt to be discharged.

Exceptions may be granted by the CEO or VP of Operations, if deemed necessary to prevent an unusually high loss to the credit union.

(Stipulated Ex. C at 1–2.) He went on to state that KFCU's management did not "contemplate" an exception for the Jamos. He promised his client would forward a "very generous" proposal, possibly involving interest forbearance and/or an extension of the loans' terms, if the Jamos decided to go forward. (*Id.* at 2.) KFCU's attorney inquired whether, if the Jamos did not wish to execute global reaffirmations, they would deliver a deed in lieu of foreclosure for their home.

Debtors' counsel requested the proposed reaffirmation agreements, but asked if the Jamos could meet with credit union managers to discuss whether an exception to the all-or-nothing policy might be granted. In return, KFCU's attorney suggested that the Jamos forward a reaffirmation proposal with terms more to their liking,

and indicated it would be favorably considered if "within reason." (Stipulated Ex. E at 1–2.) He explained, however, that "a meeting would be unproductive" because "there is no interest on [KFCU's] part in making an exception in this particular case." (*Id.* at 2.)

Debtors' counsel rejoined:

Mr. and Mrs. Jamo are in bankruptcy because they have recently encountered serious financial problems. Therefore, the only way that they can consider reaffirming their unsecured obligations to Katahdin Federal Credit Union is on the best terms that the Credit Union will permit. We have no idea what those terms are so we cannot prepare a proposal. Please prepare the various reaffirmation agreements with the best terms (from the Jamos' point of view) that the Credit Union will accept.

(Stipulated Ex. F at 1.)

KFCU responded, offering a comprehensive loan re-write which reduced the Jamos' total monthly payments from $1016 to $514. All outstanding loan balances became secured by means of two new mortgages on the Jamo home: one in the amount of $46,000 with a thirty year term at 7.875% interest and one in the amount of $15,000 with a fifteen year term at 8.00% interest. KFCU's counsel explained this arrangement was "the very best" proposal the credit union could proffer. (Stipulated Ex. G at 2.)

Debtors' counsel reviewed the proposed agreements and returned them to the credit union accompanied by following remarks:

Enclosed please find reaffirmation agreements that have been executed by my clients. While they have absolutely no desire to reaffirm unsecured debt, they are grudgingly doing so in order to be able to keep their home.

I have not executed the agreements, though my clients want me to do so. Given the economic environment in [the

debtors' home town], I cannot, with a clear conscious [sic], state that it is in my clients' best interest or that it does not impose undue hardship on them to convert about $25,000 of unsecured debt to secured debt. While I have fully explained the various options to my clients and while I believe that my clients understand the consequences of reaffirmation, I am uncomfortable in trying to determine whether my clients are acting voluntarily or whether they are succumbing to the extortion that is inherently present in the Credit Union's all or nothing approach to reaffirmation. The Credit Union's policy of requiring debtors to reaffirm unsecured debt in order to reaffirm secured debt, including debt associated with a home, may be perfectly legal. However, the policy strikes me as being tantamount to a collection action that is prohibited by the automatic stay provision of § 362.

Because of my clients' desire not to lose the home that they have worked so hard for, I have reluctantly had them sign the reaffirmation agreements. Since I cannot sign the affidavit of counsel and since the reaffirmation agreements are being executed and filed after a discharge has issued, a hearing will be necessary.

(Stipulated Ex. N at 1.)

### B. Court Proceedings

 Nine secured, collateralized reaffirmation agreements were subsequently filed with the court.[3] These were accompanied by a motion asking that they be considered, but explaining debtors' counsel's unwillingness to certify that the agreements were in his clients' best interest or that reaffirmation of unsecured debt would not impose an undue hardship on them.[4]

3. The agreements were filed 18 days after the debtors' discharge entered and several days after the case had been closed. Prodded by KFCU, the Jamos' attorney quickly and successfully moved to reopen the case. *See* § 350(b)("A case may be reopened ∴ . . . to administer assets, to accord relief to the debtor, or for other cause."). As explained below, *infra* note 5, reopening the case was insufficient, by itself, to avoid all pertinent procedural pitfalls.

4. Section 524(c)(3), detailing the prerequisites of an enforceable reaffirmation agreement, requires that an agreement filed with the court be "accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement" (if the debtor was represented by counsel), stating:

(A) such agreement represents a fully informed and voluntary agreement by the debtor;

(B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

(C) the attorney fully advised the debtor of the legal effect and consequences of—

(i) an agreement of the kind specified in this subsection; and

(ii) any default under such an agreement[.]

§ 524(c)(3). When an agreement is made by a debtor who is not represented by an attorney during the negotiations, the court must make a determination whether the agreement will result in an undue hardship on the debtor or a dependent and whether the agreement is in the debtor's best interest. *See* § 524(c)(6)(A).

Section 524 does not address hearing requirements with respect to reaffirmation agreements negotiated by a debtor represented by an attorney who, in turn, refuses to sign the certification. Counsel for KFCU contended early on that this court should not interpose itself in the reaffirmation negotiation process since both parties had counsel, citing *In re Pendlebury*, 94 B.R. 120 (Bankr. E.D.Tenn.1988). *See also In re French*, 185 B.R. 910, 913 (Bankr.M.D.Fla.1995)("A court cannot and should not dictate the terms of a reaffirmation agreement; to do so would violate the spirit, if not the letter, of the Code. The parties are free to negotiate any revisions to the original agreement they wish.").

I do not read § 524(c)(6)'s protections for unrepresented debtors as foreclosing my review of agreements involving debtors whose attorneys harbor doubts about the propriety of the proposed reaffirmation. *See BankBoston, N.A. v. Claflin (In re Claflin)*, 249 B.R. 840 (1st Cir. BAP 2000)(appellate review of an order on a reaffirmation agreement dispute, presented to the bankruptcy court for review · by debtors represented by an attorney who elected not to sign the § 524(c) declaration); *see also In re Brady*, 171 B.R. 635 (Bankr.N.D.Ind.1994)(ruling on a creditor's

KFCU responded to the debtors' filings, urging court approval of the agreements and maintaining that its (all or nothing) reaffirmation policy did not abridge § 362 or § 524. It acknowledged that, should the reaffirmation package not be approved, the credit union would foreclose its mortgage on the debtors' home.

motion for approval of a reaffirmation agreement after the debtor's attorney declined to sign the attorney declaration); *In re Briggs*, 143 B.R. 438, 461 (Bankr.E.D.Mich.1992) (stay violation case involving reaffirmation agreements that the debtor's attorney refused to sign; creditor violated the stay by attempting to foreclose court review of non-certified reaffirmations); *see cf. In re Melendez*, 235 B.R. 173 (Bankr.D.Mass.1999)(*sua sponte* review of reaffirmation agreement for improper certification by debtors' counsel). Notably, *In re Pendlebury* stated:

> Notwithstanding the relaxed provisions of § 524(c) under the 1984 Amendments respecting court approval, this court would in no way countenance overreaching by a secured creditor. The court would not hesitate in appropriate circumstances to utilize its equitable powers and interject itself into the reaffirmation process. Such a situation should, however, never occur where a debtor is represented by counsel.

94 B.R. at 124.

In the present circumstances there can be no doubt that I must review the agreements and weigh in on the Jamos' complaint seeking relief on account of KFCU's alleged, reaffirmation-related, stay violations.

5. The Jamos brought their dispute back into the § 524(c) heartland by moving to reopen their case and to vacate the discharge. The course pursued requires some comment.

Whether a post-discharge reaffirmation can be given *any* effect in light of § 524(c)(1)'s requirement that "such agreement was made before the granting of the discharge" is open to question. *See In re Collins*, 243 B.R. 217, 219–21 (Bankr.D.Conn.2000) (the timing requirement of § 524(c)(1) is substantive and not procedural, and it would be an "abrogation of the court's duty" to allow a reaffirmation agreement that was executed after the discharge order and "appears to be plainly unenforceable on its face to remain on file with the court and thus to be cloaked with a false aura of enforceability [sic]"). Part of the debate concerns whether § 524(d) contemplates court consideration of reaffirmation agreements entered into post-discharge, *see* § 524(d) ("If a discharge has been granted and if the [individual] debtor desires to make

▮ I ruled that the reaffirmations would be disapproved for noncompliance with § 524(c)(1)'s timeliness requirement unless that deficiency was rectified. Without opposition, the debtors promptly, and successfully, moved to revoke their discharge for the limited purpose of permitting consideration of the agreements.[5]

an agreement of the kind specified in subsection (c) of this section and was not represented by an attorney during the course of negotiating such agreement, then the court shall hold a hearing."); *In re Nikokyrakis*, 109 B.R. 260, 264 (Bankr.N.D.Ohio 1989) (reading § 524(d) as proof that "the Bankruptcy Code contemplates post-discharge reaffirmations"), or whether it is a poorly drafted effort to assure a hearing on *pro se* reaffirmations entered into prior to discharge, a safety latch made necessary because of the amendment to § 524 making a discharge hearing discretionary, *see In re Nidiver*, 217 B.R. 581, 583–84 & n. 1 (Bankr.D.Neb.1998).

With respect to the reopening of this case, a reaffirmation dispute as addressed by the Fifth Circuit reverberates here. *See Chase Automotive Fin., Inc. v. Kinion (In re Kinion)*, 207 F.3d 751 (5th Cir.2000). First the parties engaged in some pre-discharge discourse, next came the closure of the bankruptcy case, then came the filing of a reaffirmation agreement on a debt involving the debtors' luxury car. The agreements were filed with the court with a proposed order that disapproved the agreements, determined the debt to be unsecured, and allowed the creditor to file a motion for rehearing on the matter within 30 days. Though proof of security appeared to be available to them, the debtors filed the agreements sans security documents (and without the attorney declaration) in an apparent attempt to short-circuit the creditor. Without delay the bankruptcy court reopened the case *sua sponte* and signed the proposed order.

The Fifth Circuit found it "hard to discern" "why the bankruptcy court thought it should reopen the Kinions' Chapter 7 case in order to deny the reaffirmation agreement and strip [the creditor's] lien." *Id.* at 756 (observing that the court had granted the Kinions' discharge and their "no asset" case had been administered, and closed). The Circuit opined:

> The Bankruptcy Code permits reopening "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). Here, the debtors required no relief from the reaffirmation agreement. As shown above, there was no enforceable

Following the next hearing, I ordered that the reaffirmations would be disapproved unless they were revised within ten days or unless debtors' counsel filed a § 524(c) certification.[6] The order enjoined KFCU from taking collection action for sixty days (if and) after final disapproval of the reaffirmations and provided the Jamos an opportunity to file an adversary complaint during that sixty days.[7]

> agreement between the Kinions and [the creditor]. They were in the same position as any other Chapter 7 debtor who is discharged while a creditor retains a lien on the debtor's property: their personal liability for the debt was extinguished, but some rapprochement with the creditor would have to be reached concerning the debtor's [sic] continuing lien on the collateral. To go through the motions of "denying" an ineffective, incomplete reaffirmation agreement was at best futile. To "reopen" for this purpose, or for the further purpose of voiding [the creditor's] lien, was an abuse of discretion.

*Id.* at 756–57 (footnote omitted).

The propriety of reopening the case and vacating the Jamos' discharge (both actions taken on the debtors' motions) is a far different matter than the one addressed by the Fifth Circuit in *In re Kinion.* There, the court of appeals took strong exception to the bankruptcy court's *sua sponte* reopening of a case to consider and disapprove a reaffirmation for a secured loan, and its stripping off of the creditor's lien in the bargain. Here, the Jamos, with KFCU's assent, sought court action. I did not conduct a *pro forma* review, with an outcome in mind, or "as a pretext" for bestowing broad relief. *See In re Kinion,* 207 F.3d at 756 n. 9. And, unlike the circumstances before the Fifth Circuit, the parties' good faith in the dispute before me is beyond question.

Nevertheless, vacating the Jamos' discharge was a step not taken glibly. It was an essential step to resolve this dispute, given § 524(c)(1)'s mandate. *See In re Collins,* 243 B.R. at 221 & n. 8 (striking an untimely reaffirmation agreement from the record but noting that it is done without prejudice to the debtors's right to file a motion to vacate their discharge); *In re Edwards,* 236 B.R. 124 (Bankr.D.N.H.1999) (granting a motion to vacate discharge to allow the debtors to enter into an enforceable reaffirmation agreement). The state of the Jamos' affairs is no less pressing than the debtor's in *In re Edwards.* Edwards, was "diligently negotiating" a reaffirmation agreement of a mobile home loan with a bank prior to the entry of the discharge order. *Id.* at 125. Citing the provision for vacating an order for any reason "justifying relief from the operation of the judgment" in Federal Rule of Civil Procedure 60(b)(6), incorporated into bankruptcy practice thorough Federal Rule of Bankruptcy Procedure 9024, the court concluded that under limited circumstances the discharge could be vacated "to pave the way for enforceable reaffirmation agreements." *Id.* at 126. The court culled a two-part test from *In re Tuan Tan Dinh,* 90 B.R. 743 (Bankr.E.D.Pa.1988): "(1) the consideration of relative prejudice to the parties; and (2) the degree of the debtor's culpability in allowing the order to be entered." *In re Edwards,* 236 B.R. at 127–28.

Finally, it bears emphasizing that attention to the rules can spare both debtors and creditors an unnecessary, expensive, and potentially unsuccessful procedural meander. I join the *In re Edwards* court in recommending the avenues available to "vigilant debtors." The time restraints on performing under § 521(2) and entering into reaffirmation agreements under § 524 may be extended by motion. *Id.* at 127. *See* Fed. R. Bank. Proc. 4004(c)(2) (permitting the debtor to move for an order deferring entry of discharge). Those who fail to heed this advice may reasonably expect that motions to vacate discharge, necessitated only by inattention to the Code's requirements, will be denied, rendering tardily made reaffirmation agreements unenforceable.

Immediately after the order issued, debtors' counsel notified KFCU that his clients were ready, willing, and able to reaffirm their mortgage. He cautioned that if a stand alone mortgage reaffirmation could not be had, his clients would seek sanctions and stated categorically that he would not sign the certification vis-a-vis the unsecured obligations. (Stipu-

6. In the course of the hearing I made it crystal clear that I disapproved the proposal that pre-petition, unsecured debt become secured by the debtors' home (and thus enjoy post-bankruptcy priority ahead of their homestead exemption, *see* Me.Rev.Stat. Ann. tit. 14, § 4422(1)(West 1980 & Supp. 1999)) and that I harbored strong reservations about KFCU's attempts to link reaffirmation of the mortgage to reaffirmation of unsecured debts. The order provided the parties one last chance to strike an acceptable compromise.

7. The 60–day period was subsequently extended several times at the parties' requests.

lated Ex. P at 1.) [8] KFCU responded that, if the Jamos were willing to reaffirm unsecured debt as such, it would agree to reaffirmation of the mortgage. But it also noted that, since debtors' counsel had refused certification of reaffirmation of unsecured debt, the possibility of fruitful negotiation was nonexistent. It continued:

> This was unfortunate. The Credit Union was, and is, amendable [sic] to the creation of an agreement(s) which satisfy [sic] the Court, the Jamos, and their [sic] own policies. The Credit Union regrets that the Jamos forwarded a proposal which foreclosed this possibility.

> With regard to your promise to litigate a foreclosure, it was the Credit Union's desire that the Parties could have arrived at a mutually agreeable resolution. As foreclosing was not on the Credit Union's agenda, it would be premature to extensively respond to your assertions until such time as I can discuss that issue with Credit Union representatives. Should the Credit Union eventually foreclose, however, the terms of the Jamo's [sic] note and mortgage are that the Jamos are liable for the Credit Union's costs and fees of enforcing the obligation, and therefore, should the Credit Union prevail, the amount due increases rapidly as a result of all this litigation. Of course, the Jamos are not personally exposed to this liability, but such sums are secured by the mortgage.

(Stipulated Ex. Q at 2.)

Ultimately, the parties filed a new set of nine reaffirmation agreements. They are now before me. The agreements do not collateralize unsecured debt. They propose that the reaffirmed unsecured debt carry no interest and that it be paid over ten years at $199.43 per month. The mortgage is to be reaffirmed on its original terms.[9] The arrangement reduces the Jamos' total monthly obligation from $1016.00 to $479.50.

## C. Pending Matters

While the re-worked agreements were pending, the debtors filed their adversary complaint, asking me to determine that KFCU's refusal to reaffirm their home mortgage unless they also reaffirm all its unsecured claims violates § 362 and to order appropriate relief.

KFCU continues to condition its assent to mortgage reaffirmation on this court's approval of reaffirmation agreements for all the Jamos' obligations and a release of all claims for costs, fees, and sanctions in the pending adversary proceeding (described below).[10] Once again, the debtors have signed the agreements, but their attorney has refused to sign § 524(c) certifications for unsecured obligations.

## *Discussion*

### A. Jurisdiction

These matters are core proceedings over which I have jurisdiction pursuant to 28 U.S.C. § 157(b)(2). *See, e.g., In re Brady,* 171 B.R. at 636 (jurisdiction over motion to approve reaffirmation agreement); *In re Briggs,* 143 B.R. at 442 (core jurisdiction over a contested matter, alleging violation of the stay and seeking injunctive relief).

---

8. The Jamos' attorney also pointed out that he could find no clause in the mortgage documentation that defined filing bankruptcy as an event of default, that the only reason his clients were in arrears was the credit union's ongoing refusal to accept payments, and that, should foreclosure be initiated, his clients would controvert any assertion that they had defaulted.

9. The parties did not supply a copy of the original mortgage. Correspondence indicates that it is a variable rate mortgage. (Stipu-

lated Ex. R at 2.) The pre-bankruptcy monthly payment seems to be $255, though the letter proposing the second batch of reaffirmations sets the monthly payment at $280.07, with a 8.37% variable rate.

10. In his letter proposing these terms the attorney for KFCU observes that consummation of the agreements would "eliminate[ ] the risks of future litigation, including foreclosure." (Stipulated Ex. R at 3.)

## B. The Record

By stipulation, I base my conclusions on a paper trail derived primarily from attorney correspondence and the parties' extensive filings.

## C. Violation of the Stay

I start with the question of whether KFCU violated the stay when negotiating the reaffirmation agreements.

### 1. The Applicable Code Provisions:

#### a. Section 362(a)(6)

The Jamos' § 362 complaint calls KFCU to task for violating the prohibitions of subsection (a)(6), which provides that a Chapter 7 petition "operates as a stay, applicable to all entities, of, ... any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." § 362(a)(6).

The stay "seeks to ensure orderly administration of the debtor's estate to protect creditors' rights to equality of distribution, to provide a breathing spell for the debtor, and to maintain the status quo." *Morgan Guar. Trust Co. of New York v. American Sav. and Loan Ass'n*, 804 F.2d 1487, 1491 (9th Cir.1986) (citations omitted). *See also id.* (subsection 362(a)(6) is the Congressional preventative for "harassment of the debtor by sophisti-

cated creditors," citing House and Senate Reports). *Accord Soares v. Brockton Credit Union (In re Soares)* 107 F.3d 969, 975 (1st Cir.1997).[11] In theory, "[t]he automatic stay 'is extremely broad in scope and aside from the limited exceptions of subsection (b) should apply to almost any type of formal or informal action against the debtor or the property of the estate.'" *Wallingford's Fruit House v. City of Auburn (In re Wallingford's Fruit House)*, 30 B.R. 654, 659 (Bankr.D.Me.1983) (quoting 2 *Collier on Bankruptcy* ¶ 362.04 (15th Ed.1982)).

There is no question that KFCU's first attempt to negotiate reaffirmation agreements with the Jamos constituted, in the generic sense, an "act to collect" prepetition claims. The question here is whether, when the credit union implemented its policy by conditioning reaffirmation of its secured claim (*viz* the home mortgage) on the reaffirmation of all its claims (approximately $24,000 in unsecured debt), it committed an "act" proscribed under § 362(a)(6).

#### b. Section 524(c)

The Code's provision for enforceable reaffirmation agreements is lodged in the section governing the effect of discharge. Section § 524(c) establishes six prerequisites to an enforceable agreement.[12] They provide procedural and sub-

---

11. It may well be, given this dispute's procedural history, a portion of the creditor conduct under scrutiny occurred post-discharge, and, therefore could be viewed as violating § 524(a)'s discharge injunction. Most of it, however, occurred before the discharge entered. Though the policy objective behind the discharge injunction and the protections of the stay may differ, the statutory language of § 362(a)(6) and § 524(a)(2) is parallel and must be read to indicate that Congress meant to forbid the same acts. *See Green v. National Cash Register Co. CI Corp. Sys. (In re Green)*, 15 B.R. 75, 78 (Bankr.S.D.Ohio 1981). If a different sort of relief than will issue today were involved, the variation in remedies afforded by these sections might have greater import. *Compare* § 362(h)(providing individual debtors injured by willful violations of

automatic stay with damages, including punitive damages, remedy, plus costs and attorneys' fees), *with* § 524 (containing no express damages remedy). *Compare, e.g., Malone v. Norwest Fin. California, Inc.*, 245 B.R. 389, 395–98 (E.D.Cal.2000)(identifying implied private right of action in § 524), *with, e.g., Bessette v. AVCO Fin. Servs., Inc.*, 240 B.R. 147, 156–57 (D.R.I.1999)(determining that § 524 does not establish an implied private right of action).

12. It reads:
An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to an extent enforceable under applicable nonbankruptcy law, whether

stantive assurances that debtors are well informed of reaffirmation's legal consequences and that the burden of retaining otherwise dischargeable contractual obligations has been carefully considered in light of the debtor's financial abilities and best interests.

■ Courts considering reaffirmation disputes have routinely noted that § 524(c) contemplates *mutual* consent as a precondition to an enforceable reaffirmation agreement. *See In re Turner*, 156 F.3d 713, 718–21 (7th Cir.1998); *Home Owners Funding Corp. of America v. Belanger (In re Belanger)*, 962 F.2d 345, 348 (4th Cir.1992); *In re French*, 185 B.R. at 912; *In re Brady*, 171 B.R. at 639; *In re Pendlebury*, 94 B.R. at 122–23.[13] One oft-quoted circuit court decision has described the creditor's right of veto as absolute.

*See General Motors Acceptance Corp. v. Bell (In re Bell)*, 700 F.2d 1053, 1056 (6th Cir.1983) ("[Section] 524(c) facially contemplates that the creditor, for whatever reason, may reject any and all tendered reaffirmation offers; § 524(c) envisions execution of an 'agreement' which, by definition, is a voluntary undertaking."). *But see In re French*, 185 B.R. at 912–13 (questioning cases that posit unfettered veto power in the creditor).

Recognizing that § 524(c) contemplates the creditor's consent as a pre-requisite to reaffirmation, courts have impressed § 362(a)(6) with an exception for reaffirmation negotiations:

It appears from the language of § 362 that almost any attempt made by a creditor to collect a pre-petition debt violates the automatic stay. However, it is criti-

or not discharge of such debt is waived, only if—
 (1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
 (2)(A) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim; and
 (B) such agreement contains a clear and conspicuous statement which advises the debtor that such agreement is not required under this title, under nonbankruptcy law, or under any agreement not in accordance with the provisions of this subsection;
 (3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that—
 (A) such agreement represents a fully informed and voluntary agreement by the debtor;
 (B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and
 (C) the attorney fully advised the debtor of the legal effect and consequences of—
 (i) an agreement of the kind specified in this subsection; and

 (ii) any default under such an agreement;
 (4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;
 (5) the provisions of subsection (d) of this section have been complied with; and
 (6)(A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as—
 (i) not imposing an undue hardship on the debtor or a dependent of the debtor; and
 (ii) in the best interest of the debtor.
 (B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.
§ 524(c). *See supra* footnote 5 for a discussion of subsection (d) referred to in § 524(c)(5).

13. Of course, the rescission provision of subsection (c)(2) demonstrates that the Code provides protections to the reaffirming debtors not available under the common law of contract. *See In re Nikokyrakis*, 109 B.R. at 263 ("Although ... the [creditor] could have refused to reaffirm, it would be fundamentally unfair to permit the [creditor] simply to change its mind.").

cal to read the Bankruptcy Code as an integrated process. By so doing, one can easily recognize the potential tension between the prohibition on collection efforts provided in § 362(a)(6) and § 524(c), which authorizes negotiations to secure reaffirmation agreements. Many courts, therefore, have found that creditor collection efforts must be coercive and harassing for those efforts to constitute a violation of the automatic stay.

*Bessette,* 240 B.R. at 157 (citations omitted). *See also id.* at 158 (suggesting that there must be a threat of immediate action like foreclosure or a lawsuit); *In re Briggs,* 143 B.R. at 452 (concluding that "a literal interpretation of § 362(a)(6) creates tension between that subsection and other provisions in the Code, and suffers from terminal impracticality," stating " 'coercion' is definitive" of minimum level of stay violating action). *See cf. Watkins v. Guardian Loan Co. (In re Watkins),* 240 B.R. 668, 675–78 (Bankr.E.D.N.Y.1999) (discussing the § 524(a)(2) injunction of any "act[ ] to collect" a discharged debt in the context of the § 524(c) parameters for an enforceable reaffirmation agreement).

### c. Section 521(2)

Section 521(2) is a behind the scenes factor in reaffirmation issues.[14]

■■■ Most circuits, including the First Circuit, hold that § 521 establishes redemption, reaffirmation, and surrender as exclusive options. A debtor cannot expect to retain collateral securing a consumer debt absent redemption or reaffirmation. *See Bank of Boston v. Burr (In re Burr),* 160 F.3d 843 (1st Cir.1998); *Johnson v. Sun Fin. Co. (In re Johnson),* 89 F.3d 249 (5th Cir.1996)(per curiam); *Taylor v. AGE Fed. Credit Union (In re Taylor),* 3 F.3d 1512 (11th Cir.1993); *In re Edwards,* 901 F.2d 1383 (7th Cir.1990). *But see McClellan Fed. Credit Union v. Parker (In re Parker),* 139 F.3d 668, 672–73 (9th Cir. 1998) (§ 521(2) is a merely a notice provision); *accord Capital Communications Fed, Credit Union v. Boodrow (In re Boodrow),* 126 F.3d 43, 48–53 (2d Cir.1997); *In re Belanger,* 962 F.2d at 347–48 (4th Cir.1992); *Lowry Fed. Credit Union v. West,* 882 F.2d 1543, 1545–47 (10th Cir. 1989).

While the provision is not operative in this dispute, the case law addressing it pertains to my § 362(a)(6) analysis because § 521 cannot be ignored in the reaffirmation landscape. If nothing more, it told the Jamos that the only practical way they could keep their home was by entering into a binding reaffirmation agreement with KFCU. *See In re Claflin,* 249 B.R. 840 (First Circuit Bankruptcy Appellate Panel reversing bankruptcy court that allowed the debtor to retain collateral by dint of an unenforceable reaffirmation agreement).

### 2. Pertinent Case Law

I spotlight a handful of cases, focusing on four decisions, two that support the

---

**14.** If a debtor has scheduled consumer debt secured by estate property:

 (A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;

 (B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

 (C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title.

§ 521(2).

Jamos' complaint and two that undercut it. I touch upon a fifth that has peripheral importance.

The bankruptcy court in *Green v. National Cash Register Company* took a straightforward look at a dispute like the one before me and concluded that the creditor had violated § 362(a)(6). 15 B.R. 75. A credit union had refused to permit the debtor to reaffirm a secured automobile loan unless the debtor also reaffirmed an unsecured line of credit. *See id.* at 76. Observing that § 362(a)(6) "prohibit[s] any acts for collection of the unsecured debt," the court concluded: "Refusing to execute a reaffirmation agreement [for secured debt] unless the dischargeable unsecured debt be paid is such an act which violates the statutory rights of the debtor." *Id.* at 78.[15]

Substantively similar, but procedurally distinguishable, is *In re Guinn*, 102 B.R. 838 (Bankr.N.D.Ala.1989). There a credit union was seeking relief from stay to foreclose on the debtor's real estate. It asserted the debtor had failed to make his mortgage payments. It turned out that the debtor had tendered payments, but the credit union refused them on the ground that the debtor was no longer a credit union member and its policy forbade it to accept loan payments from nonmembers. The credit union had terminated the debtor's membership because he had declined to pay two dischargeable, unsecured debts, causing a "loss" to the institution. *See id.* at 840–41. Although cancellation of membership (by itself) was "not so valuable as to have sufficient clout as to be found coercive of the debtor to pay or to agree to pay a discharged debt," *Id.* at 842,

> [t]he asserted use of the membership-termination provision so as to prevent the debtor from being able to maintain payments on the real estate mortgage

does have sufficient clout as to be coercive and thereby to deprive [the] debtor of the benefits of having the two unsecured debts discharged in this bankruptcy proceeding. Such coercion is stayed by the provision of section 362(a) and will be forbidden under section § 524(a) upon the granting of a discharge....

*Id.*

Other courts have given creditors wide latitude in reaffirmation negotiations. KFCU commends *In re Briggs*, 143 B.R. 438. Along with several other acts complained of by the debtor, *In re Briggs* examined the operation of a credit union policy for an alleged violation of the stay. The court first noted (correctly) that a creditor cannot be compelled to agree to reaffirm an undersecured claim for the value of its collateral. From that proposition, however, it reasoned that a creditor may insist that each of multiple loans be reaffirmed:

> Because a debtor does not have the right to compel a creditor to accept "partial" reaffirmation of an undersecured indebtedness, *see, e.g., In re James*, 120 B.R. 582, 586 (Bankr. W.D.Okla.1990), there would be nothing improper about that creditor stating up front that the debt could not be selectively reaffirmed. The fact that the Credit Union's policy encompassed two separate loans, instead of just one, does not call for a different conclusion. *But see In re Green*, 15 B.R. 75, 78 (Bankr. S.D.Ohio 1981) (holding that a creditor violated § 362(a) by making repayment or reaffirmation of an unsecured loan a condition of permitting the debtor to reaffirm a secured loan, but offering no rationale to support the conclusion).

While the Code emphasizes that a reaffirmation agreement must be "volun-

---

**15.** The *In re Green* creditor's conduct was less than model in several respects: it had totaled the amounts due on the two loans and presented it as the balance on the secured loan; after the agreement was contested by the debtor's attorney, the creditor seized the debt-

or's car; and when the debtor, desperate for her vehicle, negotiated a reaffirmation of the auto loan without her attorney's advice, the credit union conditioned the arrangement on a cash pay-off of the unsecured loan. *See id.* at 76–77.

tary" on the debtor's part, *see* §§ 524(c) and (d), it is also clear that a creditor need not consent to such an agreement unless the terms are acceptable to it. *See In re Bell,* 700 F.2d 1053, 1056 (6th Cir.1983)("[Section] 524(c) facially contemplates that the creditor, *for whatever reason,* may reject any and all tendered reaffirmation offers. . . ." (emphasis added)). Thus while linking the two loans in this fashion would likely influence a reasonable person's decision regarding repayment of the line-of-credit indebtedness, I see nothing unfair about it, and I accordingly hold that the Credit Union's policy did not violate § 362(a)(6).

*Id.* at 460.

Also heralded by KFCU, *Schmidt v. American Fletcher National Bank and Trust Company (In re Schmidt),* 64 B.R. 226 (Bankr.S.D.Ind.1986) concluded that a bank's mere statement of its policy requiring reaffirmation of unsecured debt to reaffirm a secured car loan did not violate the stay. The creditor's attorney had explained the policy at a post-meeting-of-creditors hallway consultation with the debtors and their attorney. Such an explanation was not, in the court's view, an *act* of collection under § 362(a)(6). Distinguishing *In re Green,* it observed:

> Here, [the bank] did not contact the Schmidts, but only discussed its policies on reaffirmation after contacted by the Schmidts and their attorney. [The bank] did not repossess its collateral until after the Schmidts indicated that they would abandon it.

*Id.* at 228. It reasoned:

> The distinction turns on how actively [the bank] sought to collect the dischargeable unsecured debt. Here, [the bank] did not actively seek to collect the

debt, but only engaged in passive efforts to collect after approached by the Schmidts. Such passive efforts do not amount to a violation of the automatic stay.

*Id.* In the court's view, the alleged infraction amounted to no more than the creditor providing information about its policies. *See id.* at 229.

Though not a violation of the stay case, *In re Brady,* 171 B.R. 635, is worth remark. It echoes the rationale of *In re Briggs.* Ruling on a creditor's motion for approval of a reaffirmation agreement that tied reaffirmation of the debtor's car loan to reaffirmation of an unsecured line of credit, the court concluded that the creditor had the right to condition the reaffirmation of the secured debt on the reaffirmation of the unsecured debt. *See id.* at 639. Following cases emphasizing the creditor's right to unilaterally bow out of reaffirmation negotiations and expressing concern that courts might be called too far into negotiations, it stated: "As § 524(c) does not require reaffirmation of any debt, the court concludes that debtors are not entitled to reaffirm selective obligations against the will of their creditors." *Id.* at 640. The court approved the reaffirmation agreement notwithstanding debtor's counsel's protest. *See id.*

### 3. Applying Law to Facts

▮ I conclude that KFCU violated the stay.[16] Relying on its stated policy, KFCU refused to entertain the Jamos' initial request that they be permitted to reaffirm their home mortgage *because* they did not propose to reaffirm their unsecured obligations.[17] Standing its ground, the credit union rejected out of hand the Jamos' request that the point be

---

16. It is important to keep in view which action of KFCU is under § 362(a)(6) scrutiny. The debts KFCU "acted" to collect are the unsecured loans *not* the home mortgage; it is KFCU's actions to gain reaffirmation of unsecured debts that the Jamos protest. The Jamos stand ready and able to reaffirm their

home mortgage on its original terms. They are prepared to bring the obligation current as soon as they are permitted to do so.

17. KFCU suggested that the alternative for the debtors was loss of their home.

negotiated. The reaffirmation package KFCU proffered as "the very best proposal (from the Jamo's [sic] perspective)" collateralized previously unsecured loans with mortgages on the Jamos' residence.[18] Throughout the negotiation and in papers filed with this court, KFCU declared that failure to effect a comprehensive reaffirmation would "lead to foreclosure on the Debtor's [sic] home." [19]

After I had rejected the initial collateralized reaffirmation package, when the Jamos sought to reaffirm their home mortgage debt again, KFCU conceded that some terms were negotiable, but refused to sever the mortgage from reaffirmation of unsecured debt and threatened that, absent some sort of comprehensive reaffirmation it would foreclose, seeking to collect (if only *in rem*) the costs and fees it incurred in litigating reaffirmation and stay violation issues. Finally, KFCU forwarded its second set of reaffirmations (which included a requirement that releases be exchanged) to the debtors with the statement that their execution and approval would "eliminate the risks of future litigations, including foreclosure." [20]

KFCU would have me accept its conduct as nothing more than an implementation of its pragmatic, loss-reducing reaffirmation policy. It asks me to view the negotiations necessary to obtain the Jamos' acquiescence as the very process contemplated by § 524(c) and § 521(2), and tolerated by § 362(a)(6). I cannot.

It is one thing for a creditor to walk away with its collateral and its deficiency claim(s). *See In re Whatley,* 16 B.R. 394, 395 (Bankr.N.D.Ohio 1982)(creditor's policy was "never to allow a debtor 'bankrupt' to reaffirm any motor vehicle by installment payments, . . ., even if the creditor would sustain a loss by said policy"). It is quite another for a creditor to hold collateral hostage in an attempt to collect separate, unsecured claim(s). *See In re Green,* 15 B.R. at 77–78 ("A creditor is under no statutory duty to enter into an involuntary reaffirmation agreement and may decline for any reason whatever or for no reason, if the refusal in no way violates rights conferred upon a debtor."); *compare In re Burr,* 160 F.3d at 849 ("[T]he regime unambiguously prescribed by § 521(2)(A) and (B) does not so clearly undermine a chapter 7 debtor's other Code-conferred rights as to be unenforceable.").

 The automatic stay is "among the most basic of debtor protections under

---

**18.** The initial attempt of KFCU to collateralize its unsecured claims is distinguishable from reaffirmation agreement contests in which obligations are collateralized *prior* to the bankruptcy petition. In the latter case, obligations are secured prior to the petition and "are part of the 'debts secured by such property' as that phrase is used in § 521(2)(A)." *In re Greer,* 189 B.R. 219, 221 (Bankr.S.D.Fla.1995). *See also In re Brady,* 171 B.R. 635 (debtors could not selectively reaffirm obligations that were cross-collateralized pre-petition without the creditor's consent).

**19.** In addition to requiring that the Jamos pay the balance of their unsecured pre-petition indebtedness and, as a practical matter providing for cross defaults on their mortgage, this arrangement deprived them of the benefit of the residence exemption they would have enjoyed against post-bankruptcy efforts to collect those obligations. *See* Me.Rev.Stat. Ann. tit. 14, § 4422(1).

**20.** There is an additional § 362(a)(6) act alleged by the Jamos. They contend that KFCU has upped the ante by putting them in default on their mortgage; that they would be current on their mortgage save KFCU's refusal to accept post-petition mortgage payments. *See In re Briggs,* 143 B.R. at 453 (agreeing with *In re Guinn* that refusal of payments so as to put the debtor into default is a bad faith coercion of the debtor tantamount to an ultimatum). KFCU defends it rejection of payments by pleading that it was exercising extra caution to preserve the stay's *status quo.* I will not decide the point. It is not developed in this record' nor of significant importance to the Jamos' case given my conclusion with respect to KFCU's other acts. The injunction that will issue makes allowance for any payments the Jamos "missed" while this litigation pended.

bankruptcy law" and "to secure [its] important protections, courts must display a certain rigor in reacting to violations of the automatic stay." *In re Soares*, 107 F.3d at 975–76. Section 524(c)'s objective of "eliminating doubt as to the voluntariness and validity of [reaffirmation] agreement[s]," *In re Turner*, 156 F.3d at 720, and § 521's goal of assuring that creditors know debtors' intentions regarding their collateral and for assuring that the intent is timely implemented, *see* § 521(2)(A),(B), do not override the stay's *express* protections.

My conclusion is supported by the no-nonsense application of § 362(a)(6) worked by *In re Green* and *In re Guinn*. KFCU used the "clout" of the Jamos' home mortgage in an attempt to strong-arm them into reaffirming substantial unsecured, dischargeable claims. *In re Guinn*, 102 B.R. at 842–43.

The case law that KFCU champions does not survive scrutiny. There is a broad distinction between a debtor's attempt to retain a creditor's collateral via partial reaffirmation of an undersecured claim and a creditor's conditioning the reaffirmation of a secured loan on the reaffirmation of separate, unsecured loan(s). The first instance is an example of bargaining for the terms of reaffirmation; in the course the creditor may insist on its rights under the original contract. The second, like the scenario before me, presents a creditor doubly employing the leverage of its collateral: once (legitimately) regarding terms for reaffirming the secured transaction, a second time (unlawfully) to gain reaffirmation of independent obligations. *In re Briggs* failed to appreciate the difference.

For similar reasons, *In re Brady's* view that because a creditor is free to refuse to reaffirm it is free to reject selective reaffirmations is unpersuasive in the present circumstances. Whatever may be said about that proposition in the abstract, it will not hold when a creditor withholds its consent to reaffirm a secured obligation unless or until a debtor agrees to reaffirm a separate, dischargeable obligations.

Some courts would have it that § 524(c) gives creditors *carte blanche*, so long as they are "negotiating" reaffirmation. *See, e.g., In re Turner*, 156 F.3d at 718–19; *In re Bell*, 700 F.2d at 1056. I refuse to accept that proposition when "negotiating" reaffirmation of the secured claim extends to conditioning it on reaffirmation of another, unrelated claim.[21]

From a debtor's point of view, at the critical point when the advisability of reaffirming debts is undertaken, the creditor's bargained-for leverage (repossession of or foreclosure upon valued property) is brought to bear on the decision whether to pay debt for which no such leverage was bargained. Both the debtor's judgement, and counsel's or the court's best interest analysis, would be unfairly skewed.[22]

Although I am also unconvinced by decisions requiring that a creditor's negotiation tactics amount to harassment or coercion before relief for violating the automatic stay will lie, *see e.g., Bessette*, 240 B.R. at 157–58; *In re Briggs*, 143 B.R. at 452–54; *In re Schmidt*, 64 B.R. at 228, I need not address the point. By threatening foreclosure on the Jamo family's home

---

**21.** I use the term "unrelated" in the following sense: The claims are not jointly secured by the same collateral. Thus, the creditor is attempting to obtain extra-transactional leverage from its collateral. Put another way, had KFCU negotiated for cross-collateralized loans prepetition, it could have done so. And had it, it could now lawfully insist on an all-or-nothing reaffirmation on pain of surrendering the collateral.

**22.** A different conclusion would lead to the troubling necessity of evaluating whether reaffirmation of unsecured debt is in the Jamos' best interest because, without it, they would lose their home. *In re Brady* worked through such an equation without pause in its "best interest" analysis, concluding that a package-deal reaffirmation (unsecured line of credit and car loan) was in the debtor's best interest because otherwise the debtor would lose his car. *See* 171 B.R. at 640.

to extract reaffirmations for separate, dischargeable, unsecured debts, KFCU's conduct was impermissibly coercive.[23]

## 4. Remedies

The Jamos ask me to enjoin KFCU from foreclosing on their mortgage for any reason associated with this litigation, the filing of their 1999 Chapter 7 petition, the discharge of any of their unsecured debts to it, and their inability to make payments on their mortgage because of KFCU's refusal to accept payments during the bankruptcy. In addition to costs and attorney fees, they seek damages: actual and punitive.[24] KFCU requests that I forgo imposing sanctions against them of any kind.

### 1. Injunction

■ The debtors have properly initiated a request for injunctive relief by commencing an adversary proceeding. *See* Fed. R. Bankr.P. 7001(7). *Cf. In re Briggs*, 143 B.R. at 462 (on a stay violation motion, court enjoined credit union from repossessing the debtor's mobile home without adversary proceeding).

■ I conclude that an injunction such as the debtors request is warranted. I will enjoin KFCU from foreclosing on the Jamo mortgage for any reason related to their Chapter 7 filing, the present litigation, discharge of KFCU's unsecured claims, or any change in the Jamos' credit union membership status that resulted from bankruptcy or discharge. In light of the fact that the Jamos were admittedly not in default of their mortgage obligations before this dispute arose, I will further enjoin KFCU from initiating foreclosure proceedings against the Jamos on account of any alleged payment default to date,

provided, however, that the Jamos bring current their payment obligations (less interest and late fees accrued due to tardiness) under the original mortgage note within twelve months of the date of my order.

Also, in light of the fact that the pending reaffirmation brouhaha has resulted from KFCU's machinations, not the debtors, I will order that, should KFCU foreclose on the Jamos' real estate for any reason at a future date, in the course of enforcing any rights it may have to an award of attorneys' fees and collection costs, it may not seek to collect any such fees or costs as may have accrued prior to the date of my order.

I conclude that KFCU is estopped from refusing to enter into a reaffirmation agreement with the Jamos on their home mortgage. It has represented that the Jamos are not only able to make the payments on the home loan per its original terms, but on an additional $24,000 in unsecured debt (albeit on a drawn-out term). I will therefore enjoin KFCU from continuing to withhold its consent to reaffirmation of the Jamo mortgage on account of their failure to reaffirm other prebankruptcy debts to the credit union. That portion of the mortgage reaffirmation agreement that unlawfully ties its viability to reaffirmation of other obligations will be ordered stricken.

### 2. Damages, Fees, and Costs

■ KFCU's stay violations were unquestionably "willful" within the meaning of § 362(h). *See Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999)("A willful violation does not require a specific intent to violate the automatic

---

**23.** KFCU may articulate any "policy" it chooses in negotiating agreements with its members. Its policy alone, outside of bankruptcy, is of no moment. Such a policy cannot operate as a discharge waiver. *See* § 727(a)(10). And it cannot be "implemented" by the conditions on reaffirmation imposed by KFCU in this case.

**24.** Section 362(h) provides as follows:

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages. § 362(h).

stay. The standard for a willful violation of the automatic stay under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation.").

■ This entire dust-up was occasioned by KFCU's unlawful insistence that, to save their home the Jamos would have to reaffirm unrelated, unsecured obligations. As a result, the Jamos have incurred substantial legal fees and costs. There is no evidence of other objective injury.

Although KFCU stubbornly sought to implement its policy, its conduct has not been sufficiently blameworthy to warrant an exemplary damages award. *See, e.g., Lovett v. Honeywell*, 930 F.2d 625, 628 (8th Cir.1991)("egregious misconduct"); *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir.1990)("maliciousness or bad faith"); *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 228 (9th Cir.1989)("reckless or callous disregard for the law or rights of others"). *But see Solfanelli v. Corestates Bank N.A.*, 203 F.3d 197, 203 (3d Cir.2000)(willful violation if the creditor knows of the stay and the acts which violated the stay are intentional). Accordingly, I will award the Jamos their reasonable attorneys' fees and expenses incurred in connection with the reaffirmation and stay violation litigation. *See* § 362(h); *In re Crysen/Montenay Energy Co.*, 902 F.2d at 1105 ("[A]ny deliberate act taken in violation of the stay, which the violator knows to be in existence, justifies an award of actual damages.").

*D. Approval/Disapproval of Reaffirmation Agreements*

Consistent with the conclusions set forth above, I will approve the debtors' mortgage reaffirmation agreement with KFCU, striking the language linking its effectiveness to reaffirmation of other debts. The balance of the reaffirmation agreements are disapproved because they are not in the debtors' best interests. *See* § 524(c)(6), (d)(2).

*Conclusion*

For the foregoing reasons, a separate order will issue granting the Jamos' prayer for injunctive relief, awarding them their attorneys' fees and costs, and approving reaffirmation of their mortgage debt to KFCU.